**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

KEITH M. SCHUELLER, )
)
Plaintiff, )
)
v. ) C.A. No.: N14C-10-201EMD
)
BRETT CORDREY, individually and in )
his capacity as a DELAWARE STATE )
TROOPER, the STATE of DELAWARE, )
and the DEPARTMENT of PUBLIC )
SAFETY-DIVISION of STATE POLICE )
)
Defendants. )
)

**DECISION AFTER TRIAL**

Stephen Norman, Esq., The Norman Law Firm, Dagsboro, Delaware. Attorney for Plaintiff Keith M. Schueller.

Michael F. McTaggart, Esq., Deputy Attorney General, Department of Justice, Wilmington, Delaware, Attorney for Defendants Brett Cordrey, the State of Delaware, and the Department of Public Safety—Division of State Police.

## I. INTRODUCTION

The civil action involves three claims by Plaintiff Keith Schueller against Defendants

Brett Cordrey ("Cpl. Cordrey"), the State of Delaware (the "State"), and the Department of

Public Safety—Division of State Police:[1] (i) battery, (ii) gross negligence, and (iii) intentional

inflection of emotional distress.[2] Mr. Schueller is asserting his claims against Cpl. Cordrey both

individually and in Cpl. Cordrey's capacity as a Delaware State Trooper. This is the Court's

decision after trial, including the findings of fact and conclusions of law. For the reasons set

---

[1] Cpl. Cordrey, the State and the Department will be collectively referred to as the "Defendants."
[2] Mr. Schueller originally asserted a claim for negligence and a claim under Article I, Section 6 of the Delaware Constitution. The Defendants moved for summary judgment on those two claims. At the hearing on the Defendants' motion, Mr. Schueller conceded that the Defendants were entitled to summary judgment on the negligence claim. The Court then ruled that Delaware did not recognize a civil claim under Article I, Section 6 of the Delaware Constitution. See Order (i) Granting Defendants' Motion for Partial Summary Judgment and (ii) Denying Plaintiff's Motion for Summary Judgment February 13, 2017.

forth below, the Court returns a verdict in favor of the Defendants on all of Mr. Schueller's claims.

## II. THE TRIAL

The Court held a five-day trial in this civil action from February 20, 2017 through February 24, 2017 (the "Trial").[3] The Court then had both parties submit their closing arguments in written form, receiving the final post-trial paper on or about May 12, 2017.

**WITNESSES**

During the Trial, the Court heard from and considered testimony from the following witnesses:

Kelly Boyer—fact witness called by Mr. Schueller

David Balash—expert witness proffered by Mr. Schueller

R. Paul McCauley, Ph.D.—expert proffered by Mr. Schueller

Jeremy Bauer, Ph.D.—expert proffered by Mr. Schueller

Cpl. Lewis Briggs—fact witness called by Mr. Schueller

Keith Schueller—plaintiff and fact witness called by Mr. Schueller

Cpl. Michael Maher—fact witness called by the Defendants

Emanuel Kapelshon—expert witness proffered by the Defendants

Melissa Steele—fact witness called by the Defendants

Cpl. Brett Cordrey—defendant and fact witness call by the Defendants

Geoff Desmoulin, Ph.D.—expert proffered by the Defendants

All the witnesses testified on direct and were available for cross-examination.

---

[3] Super. Ct. R. Civ. P. 39(b)

**EXHIBITS**

The parties entered numerous exhibits for the Court to consider in deliberating on Mr. Schueller's claims. Mr. Schueller had the following exhibits admitted:

Pl. Ex. a: Transcribed interview of Cpl. Cordrey (February 19, 2013);

Pl. Ex. b: Transcribed interview of Cpl. Briggs (February 19, 2013);

Pl. Ex. c: Delaware State Police Firearm Services Report;

Pl. Ex. d: Medical records and invoices for Mr. Schueller from Beebe Medical Center;

Pl. Ex. e: Medical records and invoices for Mr. Schueller from Christiana Care;

Pl. Ex. f: Medical records and invoices for Mr. Schueller from Delaware Department of Corrections;

Pl. Ex. g: Medical records and invoices for Mr. Schueller from Delaware Basic Life Support;

Pl. Ex. h: Medical records and invoices for Mr. Schueller from Coastal Therapeutic Services;

Pl. Ex. i: Medical records and invoices for Mr. Schueller from Lawall Prosthetic and Orthotic, Inc.;

Pl. Ex. j: Medical records and invoices for Mr. Schueller from Aquacare of Lewes, DE;

Pl. Ex. k: Medical records and invoices for Mr. Schueller from Mid-Atlantic Family Practice;

Pl. Ex. l: Medical records and invoices for Mr. Schueller from Orthopedics of Southern Delaware;

Pl. Ex. m: Medical records and invoices for Mr. Schueller from Pivot Physical Therapy;

Pl. Ex. n: Medical records and invoices for Mr. Schueller from Delaware Neurosurgical Group, P.A.;

Pl. Ex. o: Medical records and invoices for Mr. Schueller from CNMRI, P.A.;

Pl. Ex. p: Sussex County EMS Report (February 19, 2013);

Pl. Ex. q: Delaware State Police Incident Offense Report (Agency Report No.: 12-01116);

Pl. Ex. r: X-ray image showing bullet location—P000236;

Pl. Ex. s:  X-ray image—P000237;

Pl. Ex. t:  X-ray close up—P000238;

Pl. Ex. u:  Video of area of shooting (thumb drive);

Pl. Ex. v:  Medical Images of Mr. Schueller;

Pl. Ex. x:  Images utilized by Jeremey Bauer, Ph.D.;

Pl. Ex. y:  Photos of Shooting Scene and Evidence (compilation);

Pl. Ex. z:  Photos of Shooting Scene and Evidence (Norman);

Pl. Ex. aa:  Photos of Keith Schueller;

Pl. Ex. bb:  Notes of Sgt. Maher (Measurements);

Pl. Ex. cc:  Taser Download Report;

Pl. Ex. dd:  Delaware State Police Use of Force Procedure;

Pl. Ex. ee:  Delaware State Police Use of Force Policy;

Pl. Ex. ff:  Photo of overview of property with witness notations;

Pl. Ex. ii:  Expert Report of Guy Fried, M.D.;

Pl. Ex. kk:  Life Care Plan and Report for Keith Schueller by Alex Karras;

Pl. Ex. ll:  Shovel;

Pl. Ex. mm:  Clothing worn by Mr. Schueller on February 19, 2013 (in Court's possession);

Pl. Ex. oo:  Photo of general area of incident;

Pl. Ex. pp:  First Recovery Medicaid Invoice;

Pl. Ex. qq:  Delaware Health and Social Services Medicaid Invoice;

Pl. Ex. rr:  Marked photograph of Cpl. Cordrey deposition exhibit;

Pl. Ex. ss:  Mohan report—LS—DYNTA;

Pl. Ex. Pr5:  X-ray of Mr. Schueller—side view; and

4

Pl. Ex. Pr6:  X-ray of Mr. Schueller—front view.

The Defendants had the following exhibits admitted:

Def. Ex. 1:  Large Shovel;

Def. Ex. 2:  Mr. Schueller's cargo pants from February 19, 2013;

Def. Ex. 3:  Mr. Schueller's sneakers from February 19, 2013;

Def. Ex. 4:  Mr. Schueller's shirts from February 19, 2013;

Def. Ex. 5:  Cpl. Cordrey's spent bullet casings;

Def. Ex. 6:  Cpl. Cordrey's spent Taser cartridge;

Def. Ex. 7:  Delaware State Police Crime Scene Video;

Def. Ex. 8:  Binder of exhibits containing —

    (a) Call for Service Report, DSP 1-14,

    (b) Evidence Case Report, DSP 100,

    (c) Sgt. Marvel Evidence Report, DSP 101-02,

    (d) Beebe Hospital Report, DSP 288-89,

    (e) Taser Download, DSP 163-78,

    (f) Robin Karns Life Care Plan, May 3, 2106,

    (g) DSP Scene Photos—2/1/13 and 3/8/16,

    (h) Photos from Mr. Schueller Deposition,

    (i) Mr. Schueller Deposition Exhibit #12—Plaintiff's Answers to Interrogatories;

Def. Ex. 9:  Department of Corrections SCI Video;

Def. Ex. 10:  Video recorded during Mr. Schueller's visit to crime scene in March 2014;

Def. Ex. 11:  Redacted version of newspaper article, M. Steele, Use of Deadly Force Raises Questions, Cape Gazette, June 14, 2013;

Def. Ex. 12:  MVR from Cpl. Cordrey's vehicle of February 19, 2013 Police Chase;

Def. Ex. 13: May 31, 2016 report from Dr. Harry Schwartz, Moss Rehab; and

Def. Ex. 14: Slide presented during testimony of Dr. Desmoulin.

During trial, the Court took in three Court Exhibits. These are: (i) Mr. Schueller's Video Deposition (pages 57-58); (ii) Video deposition of Cpl. Cordrey (redacted); and (iii) Article from Cape Gazette dated June 14, 2013.

### III. APPLICABLE LAW[4]

The Court will be applying the following general and specific legal principles:

**BURDEN OF PROOF BY A PREPONDERANCE OF THE EVIDENCE[5]**

In a civil case, the burden of proof is by a preponderance of the evidence. Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes the Court believe that something is more likely true than not. Preponderance of the evidence does not depend on the number of witnesses. If the evidence on any particular point is evenly balanced, the party having the burden of proof has not proved that point by a preponderance of the evidence, and the Court must find against the party on that point.

In deciding whether any fact has been proved by a preponderance of the evidence, the Court may consider the testimony of all witnesses regardless of who called them, and all exhibits received into evidence regardless of who produced them.

In this particular case, Mr. Schueller must prove all the elements of his claims by a preponderance of the evidence.[6]

---

[4] Unless otherwise indicated, the Court will consider the reasonable, ordinary person acting under the same or similar circumstances to mean a reasonable law enforcement officer acting under the same or similar circumstances.
[5] Taken from Superior Court Civil Pattern Jury Instruction 4.1.
[6] *See, e.g., Reynolds v. Reynolds*, Del. Supr., 237 A.2d 708, 711 (Del. 1967)(defining preponderance of the evidence); *Oberly v. Howard Hughes Medical Inst.*, Del. Ch., 472 A.2d 366, 390 (1984)(same).

**EVIDENCE—DIRECT OR CIRCUMSTANTIAL[7]**

Generally speaking, there are two types of evidence from which a jury may properly find the facts. One is direct evidence—such as the testimony of an eyewitness. The other is indirect or circumstantial evidence—circumstances pointing to certain facts.

As a general rule, the law makes no distinction between direct and circumstantial evidence, but simply requires that the Court find the facts from all the evidence in the case: both direct and circumstantial.

**EVIDENCE EQUALLY BALANCED[8]**

If the evidence tends equally to suggest two inconsistent views, neither has been established. That is, where the evidence shows that one or two things may have caused the injury: one for which Cpl. Cordrey was responsible and one for which Cpl. Cordrey was not. The Court cannot find for Mr. Schueller if it is just as likely that the injury was caused by one thing as by the other.

In other words, if the Court finds that the evidence suggests, on the one hand, that Cpl. Cordrey is liable, but on the other hand, that Cpl. Cordrey is not liable, then the Court must not speculate about the suggested causes of Mr. Schueller's injury; in that circumstance the Court must find for Cpl. Cordrey.[9]

**MULTIPLE DEFENDANTS[10]**

The Court notes that there are several Defendants in this case. Some may be liable while others are not. The Court will engage in a fair consideration of all of the Defendants arguments

---

[7] Taken from Superior Court Civil Pattern Jury Instruction 23.1.
[8] Taken from Superior Court Civil Pattern Jury Instruction 4.3.
[9] *See, e.g., Eskridge v. Voshell*, 1991 WL 78471, **3 (Del. April 7, 1991).
[10] Taken from Superior Court Civil Pattern Jury Instruction 5.5.

7

and defenses. If the Court finds against one Defendant, that shouldn't affect the Court's consideration of other defendants.[11]

## INTENTIONAL CONDUCT DEFINED[12]

Intentional conduct means conduct that a person undertook with a knowing desire or with a conscious objective or purpose.

## RECKLESS CONDUCT DEFINED[13]

Reckless conduct reflects a knowing disregard of a substantial and unjustifiable risk. It amounts to an "I don't care" attitude. Recklessness occurs when a person, with no intent to cause harm, performs an act so unreasonable and so dangerous that he or she knows, or should know, that harm will probably result.[14]

## WILLFUL AND WANTON CONDUCT DEFINED[15]

Willfulness indicates an intent, or a conscious decision, to disregard the rights of others. Willfulness is a conscious choice to ignore consequences when it is reasonably apparent that someone will probably be harmed.

Wanton conduct occurs when a person, though not intending to cause harm, does something so unreasonable and so dangerous that the person either knows or should know that harm will probably result. It reflects a foolhardy "I don't care" attitude.[16]

---

[11] *See Travelers Ins. Co. v. Magic Chef, Inc.*, 483 A.2d 1115 (Del. Super. 1984)
[12] Taken from Superior Court Civil Pattern Jury Instruction 5.8.
[13] Taken from Superior Court Civil Pattern Jury Instruction 5.9.
[14] *See Tackett v. State Farm Fire and Cas. Ins. Co.* 653 A.2d 254, 265-66 (Del. 1995).
[15] Taken from Superior Court Civil Pattern Jury Instruction 5.10.
[16] *Koutoufaris v. Dick*, 604 A.2d 390, 399 (Del. 1992)(a person acts in a wanton manner when aware of and consciously disregarding a substantial and unjustifiable risk to another's rights or safety).

**STATE TORT IMMUNITY—NEED FOR GROSS OR WANTON NEGLIGENCE**[17]

Under Delaware law, no damages may be recovered against the State or any State officer or employee if the claim arose because of the performance of an official duty that was conducted in good faith for the benefit of the public. There is an exception to this rule, however, if the public officer or employee acted with gross or wanton negligence. Gross or wanton negligence refers to conduct of such a nature or degree that it constitutes a gross deviation from what a reasonable, ordinary person would do in the same situation. For Mr. Schueller's claims to fall within this exception to sovereign immunity, Mr. Schueller must prove that the Defendants acted with gross or wanton negligence.[18]

**BATTERY**[19]

Batter consists of the intentional and unpermitted contact upon the person of another which is harmful or offensive. If the Court finds that Cpl. Cordrey intentionally, and without Mr. Schueller's consent, made contact with Mr. Schueller in a harmful or offensive way, then Cpl. Cordrey is liable for battery.[20]

**USE OF FORCE IN LAWFUL ARREST**[21]

A citizen has a duty to cooperate with the directions of a peace officer attempting to make a lawful arrest. If resisted, the officer may use such force as is reasonably necessary to make the

---

[17] Taken from Superior Court Civil Pattern Jury Instruction 10.12. *See also* 10 *Del. C.* § 4001(3)(State immunity); 10 *Del. C.* § 4011-4013 (1999)(county and municipal tort immunity); *Doe v. Cates*, 499 A.2d 1175 (Del. 1985).
[18] Mr. Schueller does not address 10 *Del. C.* § 4001(3) in his closing briefs. Mr. Schueller contends that gross negligence is defined as a higher level of negligence representing an extreme departure from the ordinary standard of care. Mr. Schueller also provides that gross negligence differs from recklessness as recklessness is a conscious indifference to the rights of others by taking action where the risk of harm is foreseeable but the actor consciously takes the risk. Finally, Mr. Schueller contends that the fact finder assess the conduct with a reasonableness standard—"perspective of a reasonable officer on the scene…" *See, e.g.,* Plaintiff's Closing Brief at 23-24. The Court finds and holds that the result here is the same whether the Court uses Superior Court Civil Pattern Jury Instruction 10.12 or Mr. Schueller's proposed gross negligence standard.
[19] Taken from Superior Court Civil Pattern Jury Instruction 13.2.
[20] *Brzoska v. Olson*, 668 A.2d 1355, 1360-61 (Del. 1995).
[21] Taken from Superior Court Civil Pattern Jury Instruction 13.4.

arrest.  If the Court finds that Cpl. Cordrey used excessive and unnecessary force to make the arrest of Mr. Schueller, then the Court will return a verdict for Mr. Schueller.  If the Court finds, however, that Cpl. Cordrey used reasonable and necessary force to make the arrest of Mr. Schueller, then the Court will return a verdict for Cpl. Cordrey.[22]

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS[23]**

If a person intentionally or recklessly causes severe emotional distress to another by extreme and outrageous conduct, that person is liable for the emotional distress and for any bodily harm that results from the distress.[24]

Extreme and outrageous conduct goes beyond all possible bounds of decency and would be regarded as atrocious and utterly intolerable in a civilized community.  Emotional distress includes all highly unpleasant mental reactions, including fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, and worry.  Severe emotional distress is so extreme that no reasonable person could be expected to endure it.  The law will intervene only where the distress is so severe that no reasonable person could be expected to endure it.  In this regard, the intensity and the duration of the distress are factors to be considered in determining its severity.[25]

If the Court finds that Cpl. Cordrey's conduct was outrageous and extreme and that this conduct caused Mr. Schueller to suffer severe emotional distress, then the Court must find Cpl. Cordrey and/or the Defendants liable for damages.

---

[22] *See, e.g.,* 11 *Del. C.* § 467 (2001); *In re Request for Advisory Opinion*, 722 A.2d 307, 311 (Del. 1998); *Petit v. Colmery*, 55 A. 344, 345 (Del. Super. 1903).

[23] Taken from Superior Court Civil Pattern Jury Instruction 14.1.

[24] See, e.g., *Brett v. Berkowitz*, 706 A.2d 509, 513 (Del. 1998); *Tackett v. State Farm Fire & Cas. Ins. Co.*, 653 A.2d 254, 265 (Del. 1995); *Garrison v. Medical Ctr. of Delaware*, 581 A.2d 288, 293 (Del. 1989)

[25] *See, e.g., id.*

**CREDIBILITY OF WITNESSES—WEIGHING CONFLICTING TESTIMONY**[26]

Here, the Court is the sole judge of each witness's credibility. That includes the parties. The Court considers each witness' means of knowledge; strength of memory; opportunity to observe; how reasonable or unreasonable the testimony is; whether it is consistent or inconsistent; whether it has been contradicted; the witnesses' biases, prejudices, or interests; the witnesses' manner or demeanor on the witness stand; and all circumstances that, according to the evidence, could affect the credibility of the testimony.

If the Court finds the testimony to be contradictory, the Court may try to reconcile it, if reasonably possible, so as to make one harmonious story of it all. But if the Court cannot do this, then it is the Court's duty and privilege to believe the testimony that, in the Court's judgment, is most believable and disregard any testimony that, in the Court's judgment, is not believable.

**PRIOR SWORN STATEMENTS**[27]

If the Court finds that a witness made an earlier sworn statement that conflicts with witness's trial testimony, the Court may consider that contradiction in deciding how much of the trial testimony, if any, to believe. The Court may consider whether the witness purposely made a false statement or whether it was an innocent mistake; whether the inconsistency concerns an important fact or a small detail; whether the witness had an explanation for the inconsistency; and whether that explanation made sense to the Court.

The Court's duty is to decide, based on all the evidence and the Court's own good judgment, whether the earlier statement was inconsistent; and if so, how much weight to give to the inconsistent statement in deciding whether to believe the earlier statement or the witness's trial testimony.

---

[26] Taken from Superior Court Civil Pattern Jury Instruction 23.9.
[27] Taken from Superior Court Civil Pattern Jury Instruction 23.2.

**PRIOR INCONSISTENT STATEMENT BY WITNESS**[28]

A witness may be discredited by evidence contradicting what that witness said, or by evidence that at some other time the witness has said or done something, or has failed to say or do something, that is inconsistent with the witness's present testimony.

The Court will determine whether a witness has been discredited, and if so, to give the testimony of that witness whatever weight that the Court think it deserves.

**EXPERT TESTIMONY**[29]

The parties presented expert witnesses during the course of the Trial. Expert testimony is testimony from a person who has a special skill or knowledge in some science, profession, or business. This skill or knowledge is not common to the average person but has been acquired by the expert through special study or experience.

In weighing expert testimony, the Court may consider the expert's qualifications, the reasons for the expert's opinions, and the reliability of the information supporting the expert's opinions, as well as the factors previously mentioned for weighing the testimony of any other witness. Expert testimony should receive whatever weight and credit the Court thinks appropriate, given all the other evidence in the case.

**MEASURE OF DAMAGES - PERSONAL INJURY**[30]

If the Court does not find that Mr. Schueller has sustained his burden of proof, the Court will return a verdict for the Defendants. If the Court finds that Mr. Schueller is entitled to recover for damages proximately caused by the incident, the Court should consider the compensation to which Mr. Schueller is entitled.

---

[28] Taken from Superior Court Civil Pattern Jury Instruction 23.3
[29] Taken from Superior Court Civil Pattern Jury Instruction 23.10.
[30] Taken from Superior Court Civil Pattern Jury Instruction 22.1.

The purpose of a damages award in a civil lawsuit is just and reasonable compensation for the harm or injury done. Certain guiding principles must be employed to reach a proper damages award. First, damages must be proved with reasonable probability and not left to speculation. Damages are speculative when there is merely a possibility rather than a reasonable probability that an injury exists. While pain and suffering are proper elements on which to determine monetary damages, the damages for pain and suffering must be fair and reasonably determined and may not be determined by a fanciful or sentimental standard. The damages must be determined from a conclusion about how long the suffering lasted, the degree of suffering, and the nature of the injury causing the suffering.

If the Court finds for Mr. Schueller, the Court will award to him the sum of money that in the Court's judgment will fairly and reasonably compensate him for the following elements of damages that are found to exist by a preponderance of the evidence:

(1)     compensation for pain and suffering that he has suffered to date;

(2)     compensation for pain and suffering that it is reasonably probable that Mr. Schueller will suffer in the future;

(3)     compensation for permanent impairment;

(4)     compensation for reasonable and necessary medical expenses incurred to date;

(5)     compensation for reasonable and necessary medical expenses that it is reasonably probable that Mr. Schueller will incur in the future;

(6)     compensation for loss of earnings suffered to date; and

(7)     compensation for earnings that will probably be lost in the future.[31]

---

[31] *See, e.g., Medical Ctr. of Delaware, Inc. v. Lougheed*, 661 A.2d 1055, 1060-61 (Del. 1995); *Jardel Co. v. Hughes*, 523 A.2d 518, 527-32 (Del. 1987); *McNally v. Eckman*, 466 A.2d 363, 371 (Del. 1983); *Thorpe v. Bailey*, 386 A.2d 668, 668-70 (Del. 1978).

In evaluating pain and suffering, the Court may consider its mental as well as its physical consequences. The Court may also consider such things as discomfort, anxiety, grief, or other mental or emotional distress that may accompany any deprivation of usual pleasurable activities and enjoyments.

In evaluating impairment or disability, the Court may consider all the activities that Mr. Schueller used to engage in, including those activities for work and pleasure, and you may consider to what extent these activities have been impaired because of the injury and to what extent they will continue to be impaired for the rest of his life expectancy.

The law does not prescribe any definite standard by which to compensate an injured person for pain and suffering or impairment, nor does it require that any witness should have expressed an opinion about the amount of damages that would compensate for such injury. The award should be just and reasonable in light of the evidence and reasonably sufficient to compensate Mr. Schueller fully and adequately.

## IV. DISCUSSION

The Court heard from a number of witnesses—both fact and expert. Before detailing the findings of fact and conclusions of law, the Court is going to address the credibility and effectiveness of the witnesses.

### CREDIBILITY OF WITNESSES

The Court finds that Kelly Boyer, Cpl. Lewis Briggs, Cpl. Michael Maher, and Melissa Steele are credible witnesses. The testimony of these fact witnesses was supported by other evidence in the Trial (either by other witnesses, the MVR, photographs or post incident videos). The Court considered each of these witness' means of knowledge and strength of memory. The Court also recognized their strength of memory and opportunity to observe events. The Court

14

also finds that their testimony was reasonable and responsive during the Trial. In addition, the Court observed their manner and demeanor on the stand while testifying. Importantly, Ms. Boyer and Ms. Steele carry no bias or interests in the outcome of the Trial. Ms. Boyer was at the scene of the incident, working at a nearby stable. Ms. Steele is a reporter for the Cape Gazette who interviewed Mr. Schueller soon after the February 19, 2013 shooting. The Court recognizes that Cpl. Briggs and Cpl. Maher bring a bias and an interest in the outcome of the Trial because of their affiliation with Cpl. Cordrey as Delaware State Troopers. While recognizing this, the Court still found Cpl. Briggs and Cpl. Maher to be credible witnesses given their demeanor on the stand while testifying and their responsiveness to the questions posed to them by the parties' counsel.

As for the expert witnesses, the Court finds that the expert witnesses only helped the Court realize that without credible facts surrounding the actual shooting, the Court cannot actually know what happened near the shed when Cpl. Cordrey shot Mr. Schueller. The various experts—all good at what they do—provided different conclusions on the same facts. Moreover, the parties failed to impress upon the Court that any one expert should be disregarded entirely as compared to another expert.

David Balash is a forensic expert called by Mr. Schueller. Among other things, Mr. Balash testified about his conclusions regarding the scene of the incident, the gunshot and the holes it created in Mr. Schueller's clothing, the entry wound, and that the facts support Mr. Schueller's facts regarding the incident—(i) that Mr. Schueller's torso was not moving much at the time of the shot and (ii) that Mr. Schueller was not facing Cpl. Cordrey when Cpl. Cordrey shot Mr. Schueller. Mr. Balash agreed that the shovel constituted a deadly weapon.

15

Paul McCauley and Emanuel Kapelshon were called as experts on police practices and use of force. Dr. McCauley testified on behalf of Mr. Schueller, and Mr. Kapelshon testified on behalf of the Defendants. Dr. McCauley opined that, based on his review of the facts and assumptions, Cpl. Cordrey was not justified in using deadly force—that Cpl. Cordrey created a danger zone by advancing on Mr. Schueller and Cpl. Cordrey should have de-escalated the situation and waited until back-up arrived. Dr. McCauley also testified that Mr. Schueller was not a danger to the public as he was evading arrest and not trying to harm others.[32] Not surprisingly, Mr. Kapelshon testified that, upon his review of the facts and with his assumptions, Cpl. Cordrey was justified in the use of deadly force. The Court finds the testimony of both Mr. Kapelshon and Dr. McCauley to be credible; however, the Court finds that the testimony of Mr. Kapelshon to be more helpful. As will be discussed below, the Court does believe find that a shovel can be a dangerous weapon and that a person actively resisting arrest while carrying that shovel poses a threat to officer and public safety. Moreover, the Court does not find it credible that a Delaware State Trooper should just follow a shovel toting person who is resisting arrest while that person goes about populated areas.[33]

The parties also presented expert witness on accident/injury reconstruction and kinesiologist—Geoffrey Desmoulin and Jeremy Bauer. Dr. Bauer, a rebuttal expert to Dr. Desmoulin, testified on behalf of Mr. Schueller. The Court previously limited Dr. Bauer's testimony to that of biomechanics. Dr. Bauer concluded that the evidence supported Mr. Schueller's testimony that he was walking away from Cpl. Cordrey when he was shot. Dr.

---

[32] The Court, as factfinder, disagrees with this assessment. Having viewed the MVR and listened to the witnesses' testimony, the Court ultimately finds that Mr. Schueller constituted a risk to the public and law enforcement officers. *See* Section IV at ¶¶ 41 and 42.

[33] Dr. McCauley and Mr. Kapelshon may have said it differently but both seemed to agree that the national standard is that an officer does not have the duty to retreat under these circumstances.

Desmoulin provided expert testimony on various possible ways that Mr. Schueller got shot and ended up in his final position on the ground. The Court did not find that these two experts were of much help in determining what actually happened on February 19, 2013.

The Court finds that Cpl. Cordrey provided credible testimony up and until the time of the shooting. Cpl. Cordrey's testimony is supported by the MVR from his vehicle and the testimony of several of the fact witnesses, especially the testimony of Ms. Boyer.[34] The Court found Cpl. Cordrey's demeanor on the witness stand to be good. Moreover, the Court notes that Cpl. Cordrey answered questions directly and did not attempt to avoid answering difficult questions. The Court, however, finds fault with Cpl. Cordrey's lack of memory with respect to the actual shooting. Cpl. Cordrey does not seem to remember exactly what happened when he pulled the trigger on his firearm or exactly what Mr. Schueller was doing at that point in time. The Court must consider the strength of memory of a witness and that witness' opportunity to observe. Cpl. Cordrey just does not know how Mr. Schueller got shot in the back. This is not helpful to the factfinder.

Finally, the Court finds that Mr. Schueller is not a credible witness. Mr. Schueller has provided various accounts of the facts of the incident. Moreover, Mr. Schueller's testimony at trial (and in depositions) is not supported by the testimony of other fact witnesses. The Court noted that Mr. Schueller was evasive on the witness stand when responding to difficult questions. Mr. Schueller's testimony regarding his interaction with Ms. Steele was particularly troubling. Finally, Mr. Schueller was active in his addiction at the time of the incident and this may have

---

[34] The Court, as the factfinder, recognized there are some inconsistencies in the testimony of Cpl. Cordrey, Cpl. Briggs and Ms. Boyer. The Court, however, is able to reconcile these inconsistencies to make "one harmonious story of it all."

affected his ability to actually remember the events as those events happened—*i.e.*, his strength of memory. The Court places little, to no, value on Mr. Schueller's testimony.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

1.      On February 19, 2013, by his own admission, Mr. Schueller was suffering from a relapse after 6.5 years of sobriety.

2.      Mr. Schueller is physically a big man. On February 19, 2013, Mr. Schueller was employed as a plumber's helper but had been a physical trainer in Delaware and Maryland. Mr. Schueller was, notwithstanding his relapse, in good physical condition.

3.      Mr. Schueller has previously been convicted of Burglary Third Degree (Virginia in 2007 and Delaware in 2005).

4.      Mr. Schueller had engaged in a series of thefts and was, on February 19, 2013, the subject of an arrest warrant for those offenses.

5.      Law enforcement agencies were aware of Mr. Schueller's criminal activities.

6.      On or about February 18, 2013, Mr. Schueller's Jeep Cherokee was towed to an impound lot in Lewes, Delaware.

7.      On February 19, 2013, Mr. Schueller broke into the impound lot by enlarging a hole in the fence. After breaking into the impound lot, Mr. Schueller illegally retrieved his Jeep Cherokee.

8.      Law enforcement knew that Mr. Schueller had illegally retrieved his Jeep Cherokee.

9.      Cpl. Briggs was on duty on February 19, 2013. Cpl. Briggs spotted Mr. Schueller's Jeep Cherokee and began pursuit of the vehicle on Route 1.

18

10. Cpl. Cordrey was on duty on February 19, 2013. Cpl. Cordrey responded to a call from Cpl. Briggs and joined in the pursuit of Mr. Schueller.

11. The pursuit of Mr. Schueller entered a residential neighborhood.

12. Cpl. Briggs and Cpl. Cordrey activated their vehicles' lights and sirens.

13. Mr. Schueller began to drive faster and more erratically.

14. A review of the MVR demonstrates that Mr. Schueller drove dangerously through the residential neighborhood.

15. After exiting the neighborhood, Mr. Schueller collided with an SUV that was travelling southbound on Plantations Road.

16. Mr. Schueller then jumped out of his vehicle and ran across a cornfield.

17. Cpl. Briggs exited his vehicle and began running after Mr. Schueller.

18. Cpl. Cordrey arrived and drove into the cornfield after Mr. Schueller.

19. On February 19, 2013, Ms. Boyer was a certified instructor at a stable adjacent to the cornfield.

20. Ms. Boyer heard a car crash and witnessed Mr. Schueller running across the cornfield.

21. Ms. Boyer saw Mr. Schueller running towards the riding ring and the stable.

22. Children were present at the stable. Ms. Boyer told the teachers and the children to get on the bus and lock the bus's doors.

23. Ms. Boyer watched consistently except when she moved into the stable to warn the children and their teachers.

24. Ms. Boyer could not see all that happened as, at points, trees or shrubs obstructed her view.

25. Mr. Schueller turned away from the stable and ran toward a tree line.

26. Cpl. Cordrey got out of his vehicle and ran after Mr. Schueller.

27. Mr. Schueller picked up a shovel near a goat barn as he ran for the tree line.

28. As utilized by Mr. Schueller, the shovel constituted a dangerous instrument.

29. Cpl. Cordrey drew his Taser. Initially, however, Cpl. Cordrey could not get the Taser to function properly.

30. Cpl. Cordrey stated "stop or I'll tase you."

31. After resetting the cartridge, Cpl. Cordrey fired the Taser at Mr. Schueller. Cpl. Cordrey did not hit Mr. Schueller with the Taser.

32. Mr. Schueller still had the shovel pointed toward Cpl. Cordrey.

33. Mr. Schueller appeared to surrender and Cpl. Cordrey holstered his Taser.

34. At this point, Cpl. Cordrey was 10-15 away from Mr. Schueller.

35. Mr. Schueller maintained possession of the shovel and began running again.[35]

36. Cpl. Cordrey then pulled out his firearm and began pursuing Mr. Schueller again.

37. Cpl. Cordrey and Mr. Schueller could no longer be viewed by Ms. Boyer as they went behind some shrubs. After a short time, Ms. Boyer heard a gunshot.[36]

38. After reaching another barn, Mr. Schueller again turned to face Cpl. Cordrey.

39. Cpl. Cordrey believed that Mr. Schueller could no longer retreat and was waiving the shovel around "like a crazy person."

40. Cpl. Cordrey was in fear for his safety, stating at the Trial that he felt "the greatest fear I've ever had in in my life."

---

[35] During the Trial, Mr. Schueller testified that he kept the shovel so as to prevent Cpl. Cordrey from arresting him.
[36] At the Trial, Ms. Boyer testified that the gunshot happened 5-10 seconds after she lost sight of Cpl. Cordrey and Mr. Schueller. In her deposition, Ms. Boyer testified that the gunshot happened 3-4 seconds after she lost sight of Cpl. Cordrey and Mr. Schueller.

41. Under the circumstances, Mr. Schueller presented as a legitimate threat to the safety of Cpl. Cordrey.

42. Under the circumstances, Mr. Schueller—if he remained at large—presented a legitimate threat to other Delawareans.

43. Cpl. Cordrey shot Mr. Schueller.

44. Cpl. Cordrey believed, at the time, that he shot Mr. Schueller in the chest.

45. In reality, Cpl. Cordrey shot Mr. Schueller in the back.

46. Neither Mr. Schueller nor Cpl. Cordrey have provided a reasonable explanation for how exactly Mr. Schueller got shot in the back.

47. Mr. Schueller was seriously injured and experienced partial paralysis in his legs.

48. Cpl. Briggs did not witness the shooting. Cpl. Briggs heard Cpl. Cordrey ordering Mr. Schueller to stop and heard the shot. At this point, Cpl. Briggs removed his firearm from its holster and radioed out that shots had been fired.

49. Cpl. Briggs witnessed Cpl. Cordrey in a shooting position and Mr. Schueller face down on the ground.

50. Cpl. Briggs order Mr. Schueller to roller over but, due to the partial paralysis, Mr. Schueller could not roll over.

51. Trooper Mapp arrived and helped Cpl. Briggs roll Mr. Schueller over.

52. Cpl. Briggs noticed blood on both the front and back of Mr. Schueller. Cpl. Briggs assumed that Mr. Schueller had been shot in the front of his body.

53. Cpl. Briggs noted that Cpl. Cordrey seemed scared.

54. Mr. Schueller had to be medically evacuated away from the shooting scene.

55. Mr. Schueller suffered painful injuries and some of those injuries are permanent.

56.     Mr. Schueller gave an interview to Ms. Steele in April/May of 2013.

57.     On June 14, 2013, Ms. Steele published an article in the Cape Gazette regarding the February 19, 2013 shooting.  In that article, Mr. Schueller told Ms. Steele that he never touched the shovel.  Mr. Schueller told Ms. Steele that his fingerprints will not be on the shovel, and that science and forensics will prove that Mr. Schueller is innocent.  Mr. Schueller also claimed that he never faced Cpl. Cordrey, always having his back to Cpl. Cordrey as he attempted to flee.

58.     Ms. Steele testified that the quotes attributed to Mr. Schueller in the Cape Gazette were accurate.  Ms. Steele also testified that she repeatedly asked Mr. Schueller if he had touched the shovel because she wanted to be sure on that point.

59.     Ms. Boyer is a credible witness.

60.     Ms. Steele is a credible witness.

61.     Cpl. Briggs is a credible witness.

62.     Cpl. Maher is a credible witness.

63.     Mr. Balash is a credible witness, but the Court does not find his testimony to be helpful in arriving at certain conclusion of fact regarding the February 19, 2013 shooting.

64.     Dr. McCauley is a credible witness.  The Court did find some of his testimony helpful but does not agree with his ultimate conclusions that Cpl. Cordrey failed to follow proper police practice regarding the use of force.

65.      Dr. Bauer is a credible witness, but the Court does not find his testimony to be helpful in arriving at certain conclusion of fact regarding the February 19, 2013 shooting.

66.     Dr. Kapelshon is a credible witness.  The Court finds some of his testimony helpful and agrees that Cpl. Cordrey followed proper police practice regarding the use of force.

22

67. Dr. Desmoulin is a credible witness, but the Court does not find his testimony to be helpful in arriving at certain conclusion of fact regarding the February 19, 2013 shooting.

68. Mr. Schueller has failed to carry his burden of proof that Cpl. Cordrey acted with gross or wanton negligence.

69. Clearly, Cpl. Cordrey committed intentional and unpermitted contact upon the body of Mr. Schueller; however, the Court finds that Cpl. Cordrey did not use excessive or unnecessary force under the circumstances present on February 19, 2013. As such, Mr. Schueller has failed to carry his burden of proof that Cpl. Cordrey committed the tort of battery.

70. Mr. Schueller has failed to carry his burden of proof that Cpl. Cordrey intentionally or recklessly caused Mr. Schueller severe emotional distress by any extreme and outrageous conduct.

## V. CONCLUSION

The decision here rests on who carries the burden of proof and the amount of credible evidence supporting Mr. Schueller's claims. After all of the evidence had been presented, the Court remained unable to determine when and how Mr. Schueller had turned when Cpl. Cordrey shot him—*i.e.*, whether Mr. Schueller had turned so as to be arrested, turned to leave, turned while swinging the shovel, or turned to flee just as Cpl. Cordrey aimed and fired his firearm. Mr. Schueller has presented different versions of the events on a number of occasions. Moreover, the experts were collectively unhelpful in using the forensic evidence to try to determine exactly what happened.

As developed during the Trial, Cpl. Cordrey seems to have been presented with such a dangerous situation that he believed he shot Mr. Schueller in the chest when, in fact, he shot Mr. Schueller in the back. Mr. Schueller clearly presented a danger to Cpl. Cordrey and others. Mr.

23

Schueller was actively resisting arrest and carrying/wielding a shovel. Mr. Schueller engaged in dangerous conduct when trying to escape in his Jeep Cherokee. Moreover, Mr. Schueller refused to surrender despite continual pursuit, almost being tasered and then confronted with a firearm.

Presented with this, the Court made the findings of fact and conclusions of law in Section IV above.

Accordingly, the Court returns a verdict in favor of the Defendants on Mr. Schueller's claims for (i) gross negligence; (ii) battery; and (iii) intentional infliction of emotional distress. Moreover, the Court directs the entry of a final judgment in favor of Defendants on all claims under Rule 54 of the Superior Court Civil Rules.

Dated: August 23, 2017
Wilmington, Delaware

*/s/ Eric M. Davis*
Eric M. Davis, Judge